FILED

2005 Feb-28  PM 04:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **MARY CATHERINE GRAHAM,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  CV 03-P-0723-NE** |
| | } | |
| **JOHN ASHCROFT,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

The court has before it Defendant's Motion for Summary Judgment (Doc. # 56) and Plaintiff's Motion for Summary Judgment (Doc. # 60). The above-referenced motions have been fully briefed and were under submission as of August 13, 2004.  (Docs. # 48, 55).

Plaintiff Mary Catherine Graham, a female Financial Manager with the Federal Bureau of Investigation ("FBI"), claims gender discrimination, retaliation, and hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., as amended.  (Complaint, ¶ 1). Plaintiff contends that (1) the FBI discriminated and retaliated against her when it twice denied her application to become a Special Agent ("SA") and (2) she was subjected to a sexually hostile work environment.  For the reasons outlined below, Defendant's Motion for Summary Judgment is due to be granted because there are no disputed issues of material fact and Defendant has demonstrated that it is entitled to judgment as a matter of law.  Plaintiff's Motion for Summary Judgment is due to be denied.[1]

---

[1] Plaintiff moved for summary judgment on her claims of gender discrimination and retaliation but not her claim of hostile work environment.

I.      **Legal Standards for Evaluating a Summary Judgment Motion**

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R .Civ. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-08 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984).  Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 123 S. Ct. 2148 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).[2]

_____

[2] Here, Plaintiff has presented only circumstantial evidence of discrimination.  Although Plaintiff claims she has presented direct evidence of discriminatory animus (Doc. # 85, at 4), the court finds that none of the evidence Plaintiff has presented rises to the level of direct evidence. Plaintiff relies on the following: (1) the two letters informing Plaintiff that her application for SA had been declined; (2) a statement by Brennan that Plaintiff's aggressiveness on the dating scene was considered in her declination; and (3) a February 5, 1999 memorandum by Deputy General Counsel Thomas A. Kelley (the "Kelley Memo").

With respect to the declination letters and Brennan's alleged statement, Plaintiff merely states –in a conclusory fashion–that these constitute direct evidence. (Doc. # 85, at 13; 60, at 14). Plaintiff

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of establishing a *prima facie* case of discrimination.  Second, once the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.  Finally, if the defendant carries its burden, the plaintiff must *either* show that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision.  *McDonnell Douglas*, 411 U.S. at 801-02; *Burdine*, 450 U.S. at 251-54.

---

offers no argument or analysis that this "evidence . . . if believed, would prove the existence of a fact [in issue] without inference or presumption." *Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).  Evidence that is subject to more than one interpretation, *Harris v. Shelby County Bd. of Educ.*, 99 F.3d 1078, 1083 n. 2 (11th Cir. 1996), or "devoid of any meaningful context," *Standard v. A.B.E.L., Inc.*, 161 F.3d 1318, 1329 (11th Cir. 1998), cannot constitute direct evidence.

Likewise, the Kelley Memo is not direct evidence of discrimination. Plaintiff mistates the content of the memo when she claims that Kelley found that Plaintiff's investigation was discriminatory and the background report completely unsubstantiated.  In fact, Kelley concluded that there were "legitimate and serious questions raised by the investigation as to Ms. Graham's judgment, behavior and suitability," and also found "[a] sufficient number of witnesses have given statements indicating that they have heard Ms. Graham make inappropriate comments for us to conclude that she does have a tendency to engage in behavior unsuited to an office environment. Whether this constitutes sufficient grounds to deny her a position as a SA, or whether she should be merely counseled, is a policy question." (Kelley Dep. p. 27; Ex. 1).  Kelley explained that "there may be adequate information in the record to deny her employment, but that is not a call for the General Counsel's office to make." (Kelley Dep. p. 29).  Kelley's memo did not find that discrimination had occurred, it merely expressed concern about possible litigation and emphasized that the FBI should not discriminate and should exercise its business judgment.  *See Bashara v. Black Hills Corp.*, 26 F.3d 820, 823, 824 (8th Cir. 1994) ("An expression of concern [about possible litigation] should not be equated with an admission of [discriminatory] animus on the part of [defendant], but rather should be regarded as a natural reaction to the ever-present threat of litigation attendant upon terminating [a protected] employee.").  The Eleventh Circuit "has marked severe limits for the kind of language to be treated as direct evidence of discrimination." *Jones v. Bessemer Carraway Medical Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998).  Contrary to Plaintiff's assertions, this is not a direct evidence case.

## II.   Relevant Undisputed Facts[3]

Plaintiff, a female, is currently employed by the FBI as a Financial Manager in the Atlanta Division. (Pl. Dep. p. 174, 177-178).  Plaintiff began her career at the FBI in 1997 as a Financial Analyst in the Huntsville, Alabama Resident Agency ("HRA") of the Birmingham Division. (Pl. Dep. p. 104-105; 169).  In November 2000, she received a job promotion to the Financial Manager position for the FBI Los Angeles Division.  (Pl. Dep. p. 172-173, 177). In May 2002, Plaintiff received a lateral transfer to the FBI Atlanta Division, where she works now. (Pl. Dep. p. 177).

### A.   Plaintiff's First FBI Application in 1994

In December 1994, Plaintiff made her first application for a position with the FBI. (Pl. Dep. p. 25-26; Ex. 2).  In her signed FBI application, Plaintiff was asked if she had "used marijuana during the last three years." (Pl. Dep. p. 26). Under penalty of perjury, Plaintiff answered "No." (Pl. Dep., Ex. 2).  In May 1994, while Plaintiff was in Switzerland, she used marijuana. (Pl. Dep. p. 24). Plaintiff felt that her answer "was correct in that [she] had not smoked marijuana illegally." (Pl. Dep. p. 26).  At her deposition, Plaintiff admitted that the application did not ask about "illegal" use of marijuana. (Pl. Dep. p. 31, 33).[4]

---

[3] If facts are in dispute, they are stated in the manner most favorable to the Plaintiff. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  The court notes that, even though the parties to dispute material facts, and warned the parties to stay away from argumentative and color language, the Plaintiff's factual submissions contain numerous straw man argumentative "facts" that fail to directly address Defendant's stated facts.  Moreover, Plaintiff's 124-page challenge to Defendant's statement of facts contains scores of nonmaterial facts that have nothing to do with the issues in this case.  Accordingly, the court has not included any such "facts" in its recitation.

[4] Plaintiff claims that she raised the issue of this experimental incident of marijuana use with the FBI during the hiring process.  (Pl. Dep. p. 22, 24).  Defendant claims that Plaintiff never raised the issue of her marijuana use with anyone at the FBI. (Pl. Dep. p. 30).

4

Plaintiff testified "I don't know what happened" to her 1994 application for employment, but said she was told by the FBI recruiter that her eyesight disqualified her for the position. (Pl. Dep. p. 43-44). Plaintiff's vision at the time was out of the acceptable range.  (Pl. Dep. p. 44).  Plaintiff was told to keep checking back with the FBI, because the vision policy was expected to change in the next couple of years.

### B.    Plaintiff's 1997 FBI Application For the Analyst Position

In 1997, Plaintiff applied for a position as a Financial Analyst, a non-legal position, in the FBI's HRA. (Pl Dep. p. 82, 101-102).  Edward Collins, a contract background investigator, conducted the background investigation for Plaintiff's employment.  (Collins Dep. p. 44-45, Ex. 4).  Plaintiff was selected for the position and began employment as a Financial Analyst in September 1997. (Pl. Dep. p. 170).

### C.    Plaintiff's 1998 Application for a Special Agent Position – Background Investigation

While working as a Financial Analyst, Plaintiff applied in 1998 for a SA position. (Pl. Dep. p. 45, 90).  Plaintiff passed her Phase II interview, medical exam and physical fitness test, and was issued a conditional letter of appointment for the SA position in May 1998.  (Doc. # 62, Exs. D, O).  Her appointment was conditioned on a background investigation. (*Id.*)

The Background Investigation Contract Services handbook section sets forth how derogatory information about a candidate is to be developed:

> Whenever a person furnishes derogatory information, comments or conclusions, that person must be requested to provide specific facts, details, names of other individuals or examples to support the statements being made.  *For example*, "I believe that the candidate is an alcoholic" should be supported by "because he drinks three Bloody Marys every afternoon for lunch.  I watched him do it two days this week."  Gathering opinions, conclusions or innuendos is to be minimized by thoroughly exploring the basis of the derogatory information. If the person interviewed does not

have firsthand knowledge, specific examples or any names of other individuals, so indicate in report.  *For example*, "When asked, . . . declined to (or could not) provide specific examples or names of persons who could substantiate this information." Original sources of derogatory information should be identified and interviewed.  It is not sufficient to receive this information indirectly or secondhand.  If for some reason it is not possible to interview the original source, your report must clearly show the reason.

(Doc. # 62, Ex. EE).

Plaintiff's October 1998 background investigation for the SA position was again conducted by Collins. (Collins Dep. p. 174).  Collins summarized the results of the background investigation as follows:

Employment verified and favorable from a performance standpoint.  Questions of trustworthiness, personal discretion, susceptibility to coercion, alcohol use, moral character, inappropriate sexually oriented comments in the workplace, dedication, judgment, close and continuing contact with (reported) foreign national, close contact with unreported foreign national, close contact with a member of the media, recent health problems, sexual promiscuity, sexually explicit video tape, inappropriate dress and disruptive behavior developed.  Supervisor and four coworkers recommend.  One professional associate recommends.  Two coworkers would not recommend, one recommends with reservations and one professional associate would not comment on recommendation.

(Doc. # 62, Ex. E, p. 360-387).

The background investigation reported the following incidents of a sexual nature, which have been stated in a manner consistent with Plaintiff's recollection of the incidents.  During an office luncheon at a restaurant with officials from a military intelligence unit, Plaintiff asked an FBI agent if there was enough privacy at Quantico to masturbate.  (Pl. Dep. p. 328, 342).  At her deposition, Plaintiff explained that she was "kind of kidding but just trying to explore that topic." (Pl. Dep. p. 328, 342).  In an August 2000 sworn statement, Plaintiff admitted that, while dressed in a black wig, "theatrical lenses," and "vampire fangs" for Halloween, she asked at least one co-worker, "Do you

6

want a blow job?" (Pl. Dep., Ex. 6, p. 8).[5]  Plaintiff also admitted saying to co-workers, "I thought

a good wife was one who brought home a paycheck and gave blow jobs." (Pl. Dep. p. 248, 279; Ex.

6, p. 7).  Plaintiff said that, during a discussion with co-workers regarding President Clinton and

Monica Lewinsky, she is "sure [she] used the word 'blow job.' [Although she doesn't] know exactly

what [she] said." (Pl. Dep. p. 441).  Plaintiff also discussed at work the rumor that Club Med

employees were asked by management to have "sex with the guests." (Pl. Dep. p. 305, 310; Ex. 6,

p. 8).  Plaintiff was employed at Club Med before working with the FBI.  (Pl. Dep. p. 56-68).[6]

Collins' report also noted that SA Jacqueline Albrecht (a.k.a. Jacqueline Carrico) "questions

[Plaintiff's] personal discretion, judgment, maturity and moral character and feels that she could be

put in a compromising position where she might become an embarrassment to the FBI." (Albrecht

Dep., Ex. 12).[7]

---

[5]  Plaintiff's version of this incident has changed since her August 2000 statement.  At her January 2004 deposition, she first revised her statement as follows: "I would say, Oh, yeah, if I'm wearing them, I would ask someone if they wanted a blow job.  But I wouldn't say, Do you want a blow job." (Pl. Dep. p. 295).  Then Plaintiff recounted and claimed instead that she would say, "These are the teeth that I would wear, you know, to give a blow job." (Pl. Dep. p. 296).  Now, in her summary judgment brief, Plaintiff argues that there is no evidence to support her statement at all.  (Pl.'s Brief, at 8) ("There is no evidence that Plaintiff ever asked anyone: 'Do you want a blow job?'").

[6]  Although "rumors had circulated throughout the Birmingham Office concerning her personal discretion regarding her sexual activities…[and that] she was expected to have personal relations with guests when she worked at Club Med," (Doc. # 62, Ex. D), Plaintiff denies that she was personally involved in the subject matter of the rumor.  (Doc. #62, Ex. KK).

[7]  Plaintiff denies the accuracy of Albrecht's statement, although she admits that Collins conducted an interview where he transcribed this statement and attributed it to SA Albrecht. At her deposition, SA Albrecht testified that her concerns centered on Plaintiff's inappropriate manner of dress and "hundreds" of comments by Plaintiff, including:

> Mary Catherine had told me and others that she had gone to bed with a lot of
> different men, and I -- excuse me for being crude -- she said that she enjoyed s[    ]

7

Collins reported his interview with U.S. Attorney employee Lisa Gayman as follows: "[Plaintiff had dated a] foreign national who works at a local Volvo/BMW dealership but stopped dating him because she did not want to report the contact . . . the applicant is very open with respect to her sexual activity and cannot understand why everyone else is so uptight. The applicant told Gayman that she got a list of cheap hotels in the Quantico area; her main goal is to have sex with a lot of men while she is there." (Collins Dep., Ex. 10, p. 1).[8]

Plaintiff admits that, "[she] was outspoken about [her] sexuality," (Pl. Dep., Ex. 20, p. 2), she may have called her husband a "boy toy," (Pl. Dep. p. 444-445), she may have made a remark at work that was interpreted as "male bashing," (Pl Dep. p. 249), and she "had a couple of dates" with a foreign national who worked at the Mercedes plant before she began employment with the FBI. (Pl. Dep. p. 444-445).  In a signed statement, Plaintiff described herself as follows:

> I am a colorful person, a free spirit, and there is no subject I would not talk about to anyone that wants to talk to me . . . I think people in the Huntsville RA think I am promiscuous, because I am not uncomfortable talking about sex. I have had conversations or overhear conversations of almost every person in the Huntsville RA (with the exception of SSRA Lee Leggett) talking about sex.

(Pl. Dep., Ex. 22, p. 3). Plaintiff stated that: "My conversations with other FBI employees are

---

their d[ ]. She said that – was the next statement – that many times she would discuss her sexual habits. She made statements that she was a woman who needed regular sex.

(Albrecht Dep. p. 25)

[8] Plaintiff attempts to challenge Gayman's credibility by arguing that: (1) "Lisa Gayman is a documented liar;" (2) "Gayman's lack of professionalism in the workplace rose to the level of having the United States Attorney himself admonish her;" and (3) Gayman is a "documented trouble-maker."  (Doc. # 85).

sometimes overhear [sic] by others that are not as close to me and [sic] may perceive my comments to be a bit off color, and it might not sit right with them." (Pl. Dep., Ex. 22, p. 3).

The FBI's "Adjudicative Guidelines (Suitability)" outline employment suitability factors "to ensure consistency in adjudicating the results of background investigations conducted on all Bureau applicants." (Brennan Dep., Ex. 7). Under the category of "Personal Conduct," it states: "Conduct involving questionable judgment, lack of professionalism, immaturity, unreliability, or unwillingness to comply with rules and regulations could indicate that the applicant may not effectively handle the responsibilities bestowed upon an FBI employee." (Brennan Dep., Ex. 7, p. 8). The FBI previously has declined the application of a male based on poor judgment because he had extramarital affairs and had driven a car after consuming alcohol. (Maloy Dep. p. 64).

### D.    Plaintiff's 1998 Application for a Special Agent Position – Declined

"[FBI] Headquarters ("Headquarters") is responsible for all background investigations and applicant considerations." (Leggett Dep. p. 80). Program Manager Therese Rodrique was in charge of "oversee[ing] and mak[ing] suitability adjudications for Special Agent applicants." (Rodrique Dep. p. 7).

On June 6, 1998, Supervisory Special Agent ("SSRA") Lee Leggett and Birmingham Special Agent in Charge ("SAC") Joseph Lewis told Headquarters that they highly recommended Plaintiff to the SA position based on her performance in the HRA of the Birmingham Division. (Doc. # 62, Ex. TT, p. 1).

Once completed, the background investigation was sent to Headquarters and was reviewed by the FBI Special Agent Applicant Unit. The first two reviewers, Tammy Lancaster and Deborah Brennan, were women. (Rodrique Dep., Ex. 5). On November 5, 1998, Lancaster concluded that

Plaintiff's application "should be discontinued due to her lack of suitability for a Special Agent position. She lacks good judgment, morals, and discretion when it comes to her personal behavior." (Rodrique Dep., Ex. 5, p. 3). Brennan, the second reviewer, concurred in a written note: "Discontinue - based on applicant's lack of discretion, personal behavior, reputation in the workplace with regard to her character and judgment." (Rodrique Dep., Ex. 5, p. 3).

After reviewing the background investigation report in November 1998, Birmingham SAC Lewis, who had previously recommended Plaintiff for the SA position, recommended that Headquarters deny Plaintiff's application because "[i]nformation collected through this investigation raised issues intimating candidate's inappropriate exercise of judgment . . . and suggests a failure by her to adhere to the commitment expected of Special Agents." (Leggett Dep., Ex. 5; Doc. # 62, Ex. TT, at 2-3).

On November 23, 1998, Program Manager Rodrique made the decision to deny Plaintiff's application based upon the following: "lack of good judgment displayed by applicant, particularly in areas of moral character, inappropriate sexually oriented comments, sexual promiscuity and a sexually explicit video." (Rodrique Dep. p. 42; Maloy Dep., Ex. 8. p. 2-3).  Rodrique felt that sufficient information regarding Plaintiff was substantiated for her to make the decision on Plaintiff's application. (Rodrique Dep. p. 89-90). Rodrique's supervisor, Patrick Maloy, testified that "the reason why Ms. Graham was discontinued in the applicant process for Special Agent was poor judgment." (Maloy Dep. p. 87).

Assistant Director Ruben Garcia wrote to Director Louis Freeh in September 1999:

The applicant's inappropriate behavior was also described by individuals contacted during the investigation.  To illustrate, Ms. Graham reported to work at the U.S. Attorney's Office on Halloween Day dressed in a witch's costume despite the fact that there was neither an established protocol on that day for such dress nor an after

10

> office or after hour party which would have precipitated such dress; her Halloween
> costume consisted of long, fake teeth and while wearing them she jokingly made
> solicitous offers to passing men.  In another instance, she inquired of an SA who had
> recently returned from Quantico about the sleeping arrangements and when told that
> there were two females to a room she asked, "When do you have time to
> masturbate?" In yet another instance, she told a Supervisory Assistant U.S. Attorney
> that she was expected to have personal relations with the guests when she worked at
> Club Med.

(Doc. # 62, Ex. D, p. 10 ¶ 3).

By letter dated November 23,1998, Plaintiff was notified that the FBI was "unable to offer

[her] an appointment." (Maloy Dep. p. 52; Ex. 8).

### E.    Plaintiff's First EEO Claim

On December 2, 1998, Plaintiff contacted an EEO counselor, claiming discrimination (Pl.

Dep. p. 115, 118), although she did not claim a hostile work environment (Pl. Dep. p. 474). Plaintiff

filed a formal complaint of discrimination dated February 5, 1999 alleging gender discrimination

"when I was denied a Special Agent position based on my BICS background report. . . ." (Pl. Dep.,

Ex. 9, p. 3).

### F.    The Kelley Memo

On December 14, 1998, Plaintiff wrote a letter to FBI Director Louis J. Freeh complaining

that the FBI's decision was "based on my relationships with men." (Rodrique Dep., Ex. 13).

Thereafter, Deputy General Counsel Thomas A. Kelley reviewed the situation and concluded, in a

memorandum dated February 5, 1999, that there were "legitimate and serious questions raised by

the investigation as to Ms. Graham's judgment, behavior and suitability." (Kelley Dep. p. 27; Kelley

Memo, p. 3). Kelley found:

> In fact, there does seem to be reason to conclude that Graham frequently made
> comments or remarks inappropriate to the work-place.  Nonetheless, much of the

information cited in the investigative report is hearsay and does not appear to constitute a sufficient basis for the withdrawal of the offer.

We believe that the allegations made against Ms. Graham should be further investigated and better supported by direct evidence before the FBI decides that she cannot be an agent. Most significantly, the FBI should be very certain that its actions with regard to Ms. Graham are the same as those it would take in the case of a similarly situated male applicant for the SA position . . . .

The background investigation has revealed that Ms. Graham may have a tendency to make comments which are ill-suited to an office environment . . . .

A sufficient number of witnesses have given statements indicating that they have heard Ms. Graham make inappropriate comments for us to conclude that she does have a tendency to engage in behavior unsuited to an office environment. Whether this constitutes sufficient grounds to deny her a position as a SA, or whether she should be merely counseled, is a policy question.

The evidence of the applicant's promiscuity seems exclusively based upon the comments that the applicant herself has made. While none of the interviewees claims direct knowledge of (or participation in) the applicant's sex life, it does appear that numerous individuals have heard such comments. Without expressing approval for this sort of behavior, I must, however, question whether a male applicant for the SA position has ever been rejected based on promiscuity, particularly where comments from the applicant himself constitute the only documented evidence of this behavior . . . .

The background investigation of Ms. Graham has raised some genuine concerns, not only as to her fitness for the SA position, but as to her suitability for her current employment. It is our view, however, that much of the negative information referenced in the background investigation has not been substantiated.

Further, the information provided does -- perhaps inadvertently -- give the impression that Ms. Graham's reputedly unchaste tendencies constituted the main basis for the decision to withdrawal her conditional offer of employment. This impression -- accurate or not-- is likely to create serious problems for the FBI when this matter is reviewed by the Equal Employment Opportunity Commission.

Given the legitimate and serious questions raised by the investigation as to Ms. Graham's judgment, behavior and suitability, we recommend that the background investigation be reopened and the more serious allegations (*i.e.* foreign national contacts, alcohol abuse, judgment issues and inappropriate and unprofessional behavior) be resolved. If, in fact, the allegations cannot be better substantiated, then

the FBI may wish to consider a proposal to settle Ms. Graham's EEO complaint in exchange for a reinstatement of its offer of employment.

If allegations as to Ms. Graham's behavior, suitability and judgment can be substantiated, then the FBI should succinctly set forth, in light of its own policy and precedent, its basis for withdrawing Ms. Graham's conditional offer of employment. Furthermore, we may wish to consider Ms. Graham's continued suitability for her current job.

(Kelley Memo, p. 1-4).

In March 1999, the Chief of the Applicant Processing Section responded to Plaintiff's December letter to Director Freeh and stated that her file was being reviewed and evaluated for reconsideration. (Varnum Dep. p. 108; Ex. 19). Thereafter, the background investigation was re-opened, with additional interviews. (Brennan Dep. p. 109-111).

### G.      The Re-opened Investigation

In March and May 1999, the FBI in Washington, D.C. sent investigative leads to interview persons located in Alabama, California, and Texas regarding Plaintiff. (Rodrique Dep., Ex. 23, 30). Collins was tasked with performing some of the interviews. (Rodrique Dep., Ex. 25, 32,36). Maloy felt that this reassignment made to Collins made sense because he was "familiar with the facts of the case." (Maloy Dep. p. 78).

In May 1999, when Plaintiff became aware that Collins was doing her reinvestigation, she contacted the Office of Equal Employment Opportunity Affairs, but was told she needed to contact the Applicant Processing Unit.  (Doc. # 62, Ex. K).  Plaintiff then called the Applicant Processing Unit to ask if another background investigator could be assigned. (Doc. # 62, Ex. K).

A number of witnesses were re-interviewed by Collins, including Lisa Gayman, SA Timothy Worley, SA Jacqueline Albrecht, SA Robert S. Broshears, SSRA Lee Leggett, Assistant U.S.

Attorney Hugh Victor Conrad, SA Julie Stapp, and SA David Jernigan, (Collins Dep. p. 135; Ex. 28; Rodrique Dep., Ex. 23, 30).

SA Ellingwood reported that Plaintiff accompanied her to an abortion clinic crime scene and answered a television reporter's question about the FBI's investigation by saying: "Maybe I was just here to have an abortion." (Pl. Dep. p. 355, 357, 358, 364, 369). Plaintiff admits that her statement was not true. (Pl. Dep. p. 365). She explains that "since [the reporter] was my boyfriend, we were having sex; and since we were having sex, there was a chance that, you know, I could have been pregnant. I wasn't." (Pl. Dep. p. 365, 366).[9] Ellingwood testified that Plaintiff's statement was in poor taste and that she was concerned and embarrassed by it. (Ellingwood Dep. p. 32, 42).[10]

SA Jacqueline Albrecht reported that Plaintiff had discussed "attending Mardi Gras and what you would have to do, like bear [sic] your breasts to get beads thrown to you." (Albrecht Dep., Ex. 18).[11] At her deposition, Plaintiff testified that she had attended Mardi Gras "two or three times" and that she may have lifted her shirt at some point, but denied that she would have discussed it at work. (Pl. Dep. p. 463-464). The report stated that Albrecht's concerns about Plaintiff's "discretion, judgement, maturity, and moral character are centered around the [Plaintiff's] comments in the work environment." (Pl. Dep. p. 463-464).

---

[9] Plaintiff admitted, however, that she was at the clinic on official FBI business, not a "date," and the reporter was at the clinic on "official news media business . . . to get a story." (Pl. Dep. 355-356).

[10] Plaintiff even testified that she "would have never, ever made a statement like that" to a different reporter. (Pl. Dep. p. 365).

[11] Plaintiff disputes that she made this comment to Albrecht, but does not dispute that it was part of the reinvestigation report.

14

SA Jernigan reported that Plaintiff had told him "when she worked for Club Med in Mexico, it was common knowledge and practice to have sex with guests." Although Plaintiff "did not specifically acknowledge her participation, [SA Jernigan] was led to believe by her statements that she had." (Collins Dep., Ex. 17).[12]

SA Broshears reported that Plaintiff is "very open in discussing what she does in her free-time with respect to her personal life." (Collins Dep., Ex. 14).

Many of the re-interviewed witnesses, even some of those who reported the above incidents, recommended Plaintiff for the position.

### H.    The FBI's Second Declination

After the re-interviews were completed, Headquarters reviewed the report.  Lancaster, who had reviewed Plaintiff's original application, stated that her original recommendation was the same – she recommended that Plaintiffs application be discontinued "due to [Plaintiffs] lack of suitability for a Special Agent position." (Brennan Dep., Ex. 28).  Lancaster continued: "I further state that the applicant should not have been hired as a Support Employee based on the previous background investigation." (Brennan Dep., Ex. 28).   Rodrique testified that the decision to reopen the investigation did not affect her decision: "I base the decision on the facts of the background [investigation] and I stand by that decision. ... I think that the decision was valid." (Rodrique Dep. p. 69, 70).

---

[12] As noted earlier, Plaintiff admits that at work she discussed the rumor that Club Med employees were asked by management to have "sex with the guests." (Pl. Dep. p. 305, 310; Ex. 6, p. 8).  However, Plaintiff denies that she was personally involved in the subject matter of the rumor. (Doc. #62, Ex. KK).

Brennan, the second initial reviewer of Plaintiff's original application, noted that Plaintiff's work performance at her current position as an analyst is "secondary in determining her suitability to perform the duties of the SA position." (Brennan Dep. p. 110-111; Ex. 28).

Michael E. Varnum, the newly appointed Chief of the Applicant Processing Section, testified that he made the decision to deny Plaintiff's application because her behavior "caused me to believe that there was a lack of professionalism, there was a question of judgment by the candidate." (Varnum Dep. p. 73-74; Ex. 15).

By letter dated July 21, 1999, Plaintiff was informed that her application was again denied. (Varnum Dep., Ex. 13).

I.    **After-Acquired Evidence**

Rodrique testified that the actions of Plaintiff described below would have been taken into account as further evidence to deny Plaintiff's application. (Rodrique Dep. p. 114-115).

In a sworn statement made after the FBI's second declination, Plaintiff admitted that she brought a photograph album into the workplace that she describes as follows: "One picture in the photo album was of me seated on a toilet with no clothes on, posed to not reveal the pubic area or nipples." (Pl. Dep. p. 272; Ex. 5, 22).   Although the FBI's decision maker in Washington D.C. did not refer to the nude photograph in declining Plaintiff's application, the FBI cited to the photograph in its final agency decision on Plaintiffs EEO complaints. (Pl. Dep., Ex. 17).

At her deposition, Plaintiff described the following incident:  U.S. Attorney employee Lisa Gayman was "demonstrating fellatio on a banana in front of a bunch of men," whereupon Plaintiff asked Gayman, "Okay, show me" (Pl. Dep. p. 327), and when Gayman refused, Plaintiff testified: "I respected that. I wasn't going to beg her. I thought maybe if she had something funny to show."

16

(Pl. Dep. p. 323).

In a sworn statement made after the FBI's declination, Plaintiff admitted having an extramarital affair. (Pl. Dep. p. 9-10).

**J.      Plaintiff's 1999 Discrimination Claim and Investigations Thereof**

On August 31, 1999, Plaintiff contacted an EEO counselor and complained of discrimination, retaliation, and hostile work environment. (Pl. Dep. Ex 11).

The FBI conducted an EEO investigation of Plaintiff's allegations of discrimination and retaliation and concluded that the agency's decision was based on "legitimate, nondiscriminatory and nonretaliatory reasons." (Pl. Dep. Ex 17, p. 6).   The FBI found that Plaintiff herself had "acknowledg[ed] conduct that many in the office felt was inappropriate."  (Pl. Dep., Ex. 17, p. 11-12). This acknowledgment by Plaintiff "presents more than sufficient evidence to support that [sic] FBI officials' concern about her suitability for an SA position." (Pl. Dep., Ex. 17, p. 11-12).

The FBI also found that Plaintiff failed to show a hostile work environment. (Pl. Dep., Ex. 17, p. 16). In its decision, the FBI noted that SA Jacqueline Albrecht, a female agent at Huntsville, did not believe there was a hostile work environment. (Ellingwood Dep., Ex. 4; Albrecht Dep., Ex. 4).

A separate investigation by the FBI's Office of Professional Responsibility ("OPR") was initiated by the Birmingham Division SAC. (Price Dep. p. 16, Ex. 1).  The purpose of the OPR investigation was to determine if SA Timothy Worley created a hostile work environment for SA Julie Stapp and if the two agents "created a hostile work environment between themselves." (Price Dep. p. 35, 24).  After the investigation, the FBI gave SA Worley a letter of censure for engaging in "unprofessional conduct by making adverse comments about [former SA Stapp] and about others

17

. . . ." (Price Dep., Ex. 12).  Stapp resigned from the FBI and then applied for reemployment. After her reapplication was denied, she filed a discrimination lawsuit against the FBI, which did not allege hostile work environment. (Stapp Dep. p. 39,42-43).

### K.      Facts Relevant to Plaintiff's Hostile Environment Claim

The FBI has a sexual harassment policy that instructs victims what to do if they believe they are harassed. (Defendant's Responses to Request for Production, No. 15). The FBI also has a "Sexual Harassment Hotline" to call if the victim "choose[s] not to speak with [her] supervisor." (Defendant's Responses to Request for Production, No. 15).

In December 1998, Plaintiff contacted Lorenza Moore, the FBI EEO counselor, and asked him "to guide me through the process as far as what I needed to do and when I needed to do it by." (Pl. Dep. p. 115).  Plaintiff did not file a complaint alleging sexual harassment until August 31, 1999, when she filed her second complaint of discrimination. (Pl. Dep. p. 474; Ex. 11).  Plaintiff testified that she made a "conscious decision" to wait until August 1999 to report incidents she claims were sexual harassment. (Pl. Dep. p. 427).

Plaintiff testified that if she felt offended by something at work, she would "use humor as a defense" including humor that was "sexually suggestive." (Pl Dep. p. 284).  Plaintiff admitted that her use of sexual humor in response to others' sexual humor could make other people think she is not offended and is participating in the activity. (Pl Dep. p. 285-286).

Plaintiff claims that the following incidents contributed to a hostile environment:

(1)      In August 1999, SA Worley allegedly told a support employee, Ms. Williams, to give a complaint call to Plaintiff and inform him if Plaintiff "refused to do it" (Pl Dep., Ex. 12, p. 17);

(2)     In August 1999, three male agents unsuccessfully tried to prevent the switch of a male shower facility to a female facility and SA Jernigan allegedly said "there will never be equality" and a urinal "wanted" poster appeared (Ex. 12, p. 18);

(3)     On August 31, 1999, SA Young overheard SA Worley in a telephone conversation referring to a local reporter as Cynthia Cunt and SA Worley apologized to SA Young (Pl. Dep., Ex. 12, p.18; Ex. 28; Ex. 11, p. 19);

(4)     On September 8, 1999, Plaintiff alleged that SA Worley "was trying to unilaterally deprive me of a bureau vehicle" when he asked Plaintiff to loan her government vehicle to him "because his vehicle might be recognized when he met with an informant." (Pl. Dep., Ex. 12, p. 18; Ex. 21, p. 14-15). After Plaintiff conditioned his use on a swap of vehicles, SA Worley did not borrow Plaintiff's vehicle (Pl. Dep., Ex. 11, p. 19);

(5)     On September 10, 1999, SA Worley allegedly told Ms. Williams that Knoxville, Tennessee "is about the same size as Birmingham but with less blacks. . . .  The rednecks make up for it though," (Pl. Dep., Ex. 12, p. 19; Ex. 11, p. 19);

(6)     In September 1999, Plaintiff noticed a "$3.00 Hillary Rodham Clinton bill" posted in SA Worley's work area (Pl. Dep., Ex. 12, p. 19; Ex. 11, p. 19);

(7)     On September 20, 1999, SAs Worley and Straub complained because women were not being sent to temporary duty in North Carolina (Pl. Dep., Ex. 12, p. 20);

(8)     On October 28, 1999 SA Ellingwood allegedly referred to a former FBI supervisor as a "pig" and SA Jernigan allegedly says "What's wrong with that?  That's the Bureau way" (Pl. Dep. Ex 12, p. 20);

(9)     In November 1999 and thereafter, SA Jernigan referred to the models Plaintiff used in her Ebay clothes selling business by repeating a phrase: "hands above the keyboard," allegedly referring to masturbation (Pl. Dep., Ex. 12, p. 21);

(10)    On February 15, 2000, a homeless man returned to the FBI office after Plaintiff had given him money and SA Worley told other agents that "it's [Plaintiff's] fault that he keeps coming in here" and that Plaintiff is "leading him on" (Pl. Dep., Ex. 12, p. 21);

(11)    On March 22, 2000, Assistant Special Agent in Charge James Cleaver allegedly said that the problems in the Huntsville office "are over and through and in the past" (Pl. Dep., Ex. 12, p. 21);

(12)    On March 23, 2000, SA Worley allegedly told SA Farr "you don't want to cause a hostile work environment like I did" (Pl. Dep., Ex. 12, p. 22);

(13)    On April 4, 2000, SA McVay allegedly laughed to SA Stelly about a civil rights training session (Pl. Dep., Ex. 12, p. 22);

(14)    On April 4, 2000, after Plaintiff finished jogging with Williams ahead of her, other agents chanted "loser" to her (Pl. Dep., Ex. 12, p. 22; Ex. 21, p. 17);

(15)    On June 16, 2000, SA Worley allegedly questioned Plaintiffs effectiveness as a Financial Analyst (Pl. Dep., Ex. 12, p. 22);

(16)    On an unknown date, SA Stapp was allegedly told that other agents were upset that she was working part-time (Pl. Dep., Ex. 12, p. 23);

(17)    On unstated dates, some male agents went to breakfast together and allegedly excluded and discussed Plaintiff, SA Stapp, SA Ellingwood and SA Young. (Pl. Dep. Ex 12, p. 23).

## III.    Applicable Substantive Law and Discussion

### A.    Disparate Treatment in Promotions

In order to establish a *prima facie* case of disparate treatment in promotions based on sex, Plaintiff must show: (1) she is a member of a protected class; (2) she suffered an adverse job action; (3) her employer treated similarly-situated employees outside her classification more favorably; and (4) she was qualified to do the job. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997); *Coutu v. Martin Cty. Bd. of Cty. Commissioners*, 47 F.3d 1068, 1073 (11th Cir. 1995).

Plaintiff argues that, because of her sex, she was not promoted to the SA position in November 1998 or upon reconsideration in July 1999. (Docs. # 1, Counts I and III; 85, at 7; 60, at 4). Defendant argues that Plaintiff has failed to make out a *prima facie* case because she was not qualified for the SA position and has not demonstrated that similarly situated males were treated

more favorably. The court will assume, without deciding, that Plaintiff has established a *prima facie* case of discrimination related to the promotion decisions at issue.

### 1.    Defendant has articulated legitimate, nondiscriminatory reasons for the declinations at issue

Assuming that Plaintiff has established her initial burden of establishing a *prima facie* case, the burden shifts to the Defendant to articulate one or more legitimate, nondiscriminatory reasons for the employment actions in question.  A reason offered may be either objective or subjective if it is premised upon facts that are particular (*i.e.* clear and reasonably specific). *Chapman v. AI Transport*, 229 F.3d 1012, 1034-35 (11th Cir. 2000); *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1280 (11th Cir. 2000). Neither the court nor the Plaintiff should presume to judge whether an employment decision is fair or wise, but only whether it is legal. *Chapman*, 299 F.3d at 1030 n.19; *see also Pennington v. City of Huntsville*, 251 F.2d 1262 (11th Cir. 2001).

Defendant maintains that Plaintiff was not selected for the SA position because her poor judgment rendered her unqualified.  Defendant points out that a female decision maker, Program Manager Therese Rodrique, found that Plaintiff's behavior constituted poor judgment unfit for an SA. (Rodrique Dep., Ex. 5, p. 3, 42; Maloy Dep., Ex. 8, p. 2-3).[13]  The "Adjudicative Guidelines"

---

[13] Plaintiff does not dispute that FBI headquarters is responsible for background investigations and applicant considerations (Leggett Dep. p. 80), and that it was Rodrique's job to make "suitability adjudications for Special Agent applicants." (Rodrique Dep. p. 7).  Plaintiff has made no allegation of discriminatory animus on the part of Rodrique.  Rather, Plaintiff argues that her case "does not revolve around the merits of the actual decision [to decline her application], but the process itself."  (Pl. Brief at p. 15).  Plaintiff argues that other persons with discriminatory animus – Ed Collins, Tim Worley, Dave Jernigan, Lisa Gayman, and Jackie Albrecht – were decisionmakers because they were involved in the job application process by contributing input to Rodrique.  (*See* Plaintiff's Response to Def. Fact. No. 103).  The undisputed evidence does not support Plaintiff's contention that all of these additional persons were decisionmakers like Rodrique.  Plaintiff has not shown that Rodrique was a mere "rubber stamp" of any discriminatory animus held by those who made recommendations. *Stimpson v. City of Tuscaloosa,* 186 F.3d 1328, 1331 (11th

state: "Conduct involving questionable judgment, lack of professionalism, immaturity, unreliability, or unwillingness to comply with rules and regulations could indicate that the applicant may not effectively handle the responsibilities bestowed upon an FBI employee." (Brennan Dep., Ex. 7, p. 8). Defendant relies on the following incidents, most of which Plaintiff admits to be true, as examples of Plaintiff's poor judgment.[14]

### a.      Comments of a sexual nature

During an office luncheon at a restaurant with officials from a military intelligence unit, Plaintiff asked an FBI agent if there was enough privacy at Quantico to masturbate. (Pl. Dep. p. 328, 342). At her deposition, Plaintiff explained that she was "kind of kidding but just trying to explore that topic." (*Id.*).

---

Cir. 1999). To the contrary, the evidence suggests that the recommendations made to Rodrique were not binding, and that Rodrique could "accept or reject" those opinions. (Lancaster Dep. p. 14-16). Rodrique arrived at a different conclusion than was suggested by many of the persons making recommendations. Moreover, the evidence shows that many of the recommenders who provided derogatory information about Plaintiff also praised her work performance (Doc. # 62, Worley Interview, Jernigan Dep. p. 27-29, Gayman Interview, Albrecht Dep. p. 374), which necessitated an independent evaluation by Rodrique.

[14] While Plaintiff admits that most of the incidents which served as the basis for the FBI's denial did occur, she does dispute the specifics of some of those incidents. Specifically, Plaintiff disputes the legitimacy of a sexually explicit video, the "subjective judgments of individuals who hold women to a different standard than men," and the information regarding her foreign national contacts. Nonetheless, Defendant does not have to show the accuracy or inaccuracy of the information - only that it believed and acted in good faith on the information. *See Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1324, n.16 (11th Cir. 1998) ("[F]ederal courts do not sit to review the accuracy of the employer's fact findings or of the employer's decision to terminate a plaintiff's employment"); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir.1984) (holding that an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason"). Indeed, "[t]hat the employee did not in fact engage in misconduct reported to the employer is irrelevant to the question whether the employer believed the employee had done wrong." *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (citation omitted).

In an August 2000 sworn statement, Plaintiff admitted that, while dressed in a black wig, "theatrical lenses," and "vampire fangs" for Halloween, she asked at least one co-worker, "Do you want a blow job?" (Pl. Dep., Ex. 6, p. 8).[15] Plaintiff also admitted saying to co-workers, "I thought a good wife was one who brought home a paycheck and gave blow jobs." (Pl. Dep. p. 248, 279; Ex. 6, p. 7). Plaintiff said that, during a discussion with co-workers regarding President Clinton and Monica Lewinsky, she is "sure [she] used the word 'blow job.' [Although she doesn't] know exactly what [she] said." (Pl. Dep. p. 441).

Plaintiff also discussed at work the rumor that Club Med employees were asked by management to have "sex with the guests." (Pl. Dep. p. 305, 310; Ex. 6, p. 8). Plaintiff was employed at Club Med before working with the FBI. (Pl. Dep. p. 56-68).[16]

Plaintiff admits that she is "outspoken about my sexuality" (Pl. Dep., Ex. 20, p. 2), that she "talked about sex in general and men in general" at the office (Pl. Dep., Ex. 4, p. 2), that others might consider her comments "off color," that she may have made a remark that was considered "male bashing," and that she may have referred to her husband as a "boy toy" to her FBI colleagues. (Pl Dep. p. 249, 444-45; Ex. 22, p. 3).

### b.    False Comment to a Television Reporter[17]

Plaintiff accompanied SA Rebecca Ellingwood to an abortion clinic crime scene and

---

[15]  As noted earlier, Plaintiff's version of this incident has changed since her August 2000 statement.

[16]  As noted earlier, Plaintiff denies that she was personally involved in the subject matter of the rumor.  (Doc. #62, Ex. KK).

[17]  This incident was reported after Plaintiff was denied the SA position in November 1998 but before the July 1999 second declination.

answered a television reporter's question about the FBI's investigation by saying: "Maybe I was just here to have an abortion."  (Pl. Dep. p. 355, 357, 358, 364, 369).  Plaintiff admits that her statement was not true.  (Pl. Dep. p. 365).  She explains that "since [the reporter] was my boyfriend, we were having sex; and since we were having sex, there was a chance that, you know, I could have been pregnant.  I wasn't."  (Pl. Dep. p. 365-66).  Plaintiff admitted, however, that she was at the clinic on official FBI business, not a "date," and the reporter was at the clinic on "official news media business . . . to get a story."  (Pl. Dep. p. 355-56).  Ellingwood testified that Plaintiff's statement was in poor taste and that she was concerned and embarrassed by it.  (Ellingwood, Dep. p. 32, 42).  Plaintiff even testified that she "would have never, ever made a statement like that" to a different reporter. (Pl. Dep. p. 365).  Defendant claims that Plaintiff's comment violated FBI policy regarding media contacts.  (Ellingwood Dep. p. 31-32; Maloy Dep. p. 40).

Defendant also claims that, after Plaintiff's application was declined for the second time, it learned of the following additional evidence which also demonstrates her poor judgment, unprofessionalism, lack of maturity and lack of discretion.  *Shahar v. Bowers*, 114 F.3d 1097, 1107 n. 21 (11th Cir. 1997) (holding that "after-acquired evidence" can be relevant to remedy).  In her 1994 application to the FBI, Plaintiff denied, under penalty of perjury, that she used marijuana despite having admittedly used marijuana seven months earlier.  (Pl. Dep. p. 31, 33; Ex. 2).  Plaintiff admitted at her January 2004 deposition that her application answer about marijuana use was "not accurate" (Pl. Dep. p. 31, 33).  Plaintiff claims that she never *illegally* used marijuana. (See Plaintiff's Response to Defendant's Statement of Material Facts, ¶'s 24-39)).  Rodrique opines that Plaintiff's denial about marijuana use is "a disqualifier in and of itself."  (Rodrique Dep. p. 114-15). Plaintiff also brought a photograph to work which showed "me seated on a toilet with no clothes on,

posed to not reveal the pubic area or nipples." (Pl. Dep. p. 272; Exs. 5, 22, p. 3). Plaintiff claims that the photo is not an issue because it is "dark and obscure" and does not reveal that she is naked. Other employees who saw the photograph found it "revolting" to see Plaintiff "on the pot." (B. Williams Dep. p. 44). At her deposition, Plaintiff described the following incident: U.S. Attorney employee Lisa Gayman was "demonstrating fellatio on a banana in front of a bunch of men," whereupon Plaintiff asked Gayman, "Okay, show me" (Pl. Dep. p. 327) and when Gayman refused, Plaintiff testified: "I respected that. I wasn't going to beg her. I thought maybe if she had something funny to show." (Pl. Dep. p. 323). Finally, Plaintiff's admission of a past extramarital affair constitutes conduct specifically disapproved by the FBI's employment guidelines. (Pl. Dep. p. 9-10).[18]

To the extent that Plaintiff argues, outside of the after-acquired evidence context, that Defendant's failure to discipline her for these judgment problems undermines its ability to rely upon them to deny her a promotion, that assertion is in error. First, as already noted, there is a difference

---

[18] Pursuant to *McKennon v. Nashville Banner*, 513 U.S. 352, 360 (1995), in order to limit the relief available to Plaintiff, Defendant must show that it would have taken a similar action on the basis of subsequently discovered misconduct. Plaintiff claims that Defendant cannot rely on "after-acquired evidence" because no disciplinary action was taken as a result of the additional evidence. Plaintiff points out that no conduct of hers was ever referred to the Office of Professional Standards at the FBI (Doc. # 62, at Ex. B), nor has she suffered any job-related repercussions. (Doc. # 62, Ex. K). The court is not persuaded by Plaintiff's argument. That Defendant chose not to punish Plaintiff for her conduct does not mean that Defendant cannot rely on that same conduct as further evidence of Plaintiff's unsuitability for the SA position. It is undisputed that "the FBI's standards for the suitability of applicants is a different threshold . . . than to fire someone as an employee, or to revoke their security clearance." (Rodrique Dep. p. 27). Moreover, Defendant points out that different job positions within the FBI require the exercise of judgment "in varying degrees." (Maloy Dep. p. 83). However, the court declines to consider the after-acquired evidence for a different reason: the defense does not avoid liability for a defendant, but rather limits the Plaintiff's remedy. Therefore, it does not come into play until trial, when a trier of fact must determine whether a remedy is available to a Plaintiff. At this stage, based upon Rule 56, the court is only determining if there is sufficient evidence to allow Plaintiff to go to trial and seek a remedy.

between determining one's suitability for a promotion and firing a person for errors in judgment. Second, Plaintiff was a Financial Manager who sought to be an SA – an investigative agent. Case law recognizes the importance of good judgment by government investigative agents. *See Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 670 (1989) (government has compelling interest to ensure that customs agents "have unimpeachable integrity and judgment"); *Jung v. Reno*, 1995 WL 881190, p. 18 (D.D.C. 1995) ("the work of the [FBI] special agent . . . calls for one who exercises good judgment and who is emotionally stable"); *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 59 (1st Cir. 2003) ("demonstrated poor judgment" by special agent was valid reason for low performance evaluations); *Holbrook v. Reno*, 196 F.3d 255, 259 (D.C.Cir. 1999) (FBI special agent trainee found unsuitable, due in part to her "poor judgment"). Thus, it is not inconsistent for the FBI to decide that Plaintiff's poor judgment disqualified her from being promoted to SA even though it did not affect her current position as a Financial Manager.

Viewing these facts in the light most favorable to Plaintiff, the court finds that there are facts from which a reasonable employer could determine that Plaintiff exhibited poor judgment unfit for the SA position. Therefore, Defendant has met its "exceedingly light" burden to articulate legitimate, nondiscriminatory reasons for its decisions. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994).[19]

---

[19] Plaintiff claims that the entire background investigation was "tainted" and, therefore, Defendant cannot produce a lawful motivation for her non-selection because "no decision makers in the entire process could have known whether or not the Plaintiff's record was deserving of the desired employment." (Doc. # 85, at 14). This argument misses the mark given that Plaintiff admits the truth of most of the incidents described in the background investigation report. Even assuming that some of the reported incidents did not occur exactly as set forth in the report, the evidence is sufficient for a reasonable employer to conclude that Plaintiff demonstrated poor judgment. *See Chapman*, 229 F.3d at 1024-25 (holding that, where the defendant articulates multiple, reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons).

### 2.    Plaintiff Has Failed to Show That Defendant's Reasons Are Pretextual

In an attempt to show pretext, Plaintiff points to the following: (1) the Kelley Memo, which Plaintiff claims shows that Collins' background investigation was biased; (2) the withdrawal of the Birmingham office's June 1998 recommendation of Plaintiff for SA; and (3) Plaintiff's belief that she did, in fact, demonstrate good judgment.  None of these approaches is persuasive.[20]

First, Plaintiff argues that the Kelley Memo demonstrates that Collins' written summaries of his interviews with Tim Worley, Lisa Gayman, and David Jernigan were gender- biased and that Collins "impermissibly infected" the background investigation process.   The court disagrees.  As the court noted earlier, the Kelley Memo was a legal assessment, not an admission of liability. Contrary to Plaintiff's representations, the memo did not find that discrimination had occurred, but merely expressed concern about possible litigation and emphasized that the FBI should not discriminate and should exercise its business judgment.[21]

---

[20] The court notes that Plaintiff's task in proving pretext in this case is a "difficult burden" given that the decision-maker, Rodrique, is also female.  *Elrod v. Sears, Roebuck and Co.,* 939 F.2d 1466, 1471 (11th Cir. 1991)  (finding that alleged discriminators who are in same protected class as plaintiff "are more likely to be the victims of age discrimination than its perpetrators").  Rodrique testified that there is "no difference in standards for character issues for males and females in regard to Special Agent hiring decisions."  (Rodrique Dep. p. 45-46).

[21] Kelley noted:

The evidence of the applicant's promiscuity seems exclusively based upon the comments that the applicant herself has made.  While none of the interviewees claims direct knowledge of (or participation in) the applicant's sex life, it does appear that numerous individuals have heard such comments.  Without expressing approval for this sort of behavior, I must, however, question whether a male applicant for the SA position has ever been rejected based on promiscuity, particularly where comments from the applicant himself constitute the only documented evidence of this behavior.

(Kelley Memo p. 3.)

Moreover, Plaintiff's contention that Collins' 1998 interviews were gender-biased is undermined by the fact that Collins is the same person who favorably investigated Plaintiff in 1997, resulting in her employment with the FBI.  (See Pl. Dep., Ex. 11, p. 23).  *See Proud v. Stone*, 945 F.2d 796, 797 (4th Cir.1991) (holding that, under the "same actor" rule, where the same person is involved in the hiring and firing, "a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer").  Plaintiff admits that, during his 1997 background investigation, Collins did not uncover the acts of "unprofessionalism or unsuitability for the FBI" that he later found in 1998.  (Pl. Dep., Ex. 11, p. 23).[22]

Plaintiff also points out that in June 1998, the Birmingham office recommended her for the SA position, but withdrew that recommendation after reviewing the background investigation report.  (Doc. # 62, Ex. M at 1-3; Ex. B at 11).  This is not evidence of pretext.  The June recommendation was based on Plaintiff's job performance strengths, but Defendant has not put Plaintiff's performance at issue in this case.  That the Birmingham office recommended Plaintiff because it believed her to be qualified based on her performance alone does not indicate that the withdrawal of that recommendation – based on concerns with Plaintiff's character and judgment – was pretextual.

Finally, Plaintiff quarrels with Defendant's conclusion that she exercised poor judgment: Plaintiff believes that she has demonstrated good judgment and that the statements of Jernigan, Worley, Albrecht and Gayman "are an aberration in the context of Plaintiff's career." (Doc. # 89, at 4).  Plaintiff points out that she has been twice promoted and consistently received "superior" and

---

[22] As noted earlier, Plaintiff's argument that she was not offered the opportunity to address the findings in the background investigation is of no moment.  Plaintiff admitted that she committed many of the acts in question.

"exceptional" performance evaluations. (Doc. # 89, at 4-5). Once again, Plaintiff's argument misses the mark. Plaintiff's good performance – and Plaintiff's poor judgment – are two separate issues. The existence of one does not imply the non-existence of the other. In fact, FBI Headquarters noted that Plaintiff's work performance in her Analyst position was "secondary in determining her suitability to perform the duties of the SA position." (Brennan Dep. p. 110-111; Ex. 28). Regardless, Plaintiff's personal opinion of her judgment does not create a genuine issue of material fact as to whether Defendant honestly believed that she demonstrated poor judgment unfit for the SA position. *Holifield v. Reno*, 115 F. 3d 1555, 1565 (11th Cir. 1997) (reiterating that the opinion of the decision-maker, not the employee's own perception of his own abilities, is what matters in an intentional discrimination case). Defendant's assessment of Plaintiff's character, albeit subjective, is premised upon facts that are clear and reasonably specific. *Chapman*, 229 F.3d at 1034-35.

The court finds that Plaintiff's purported evidence of pretext falls short of satisfying her burden. Plaintiff has done nothing more than disagree with Defendant's assessment of her character. Defendant has consistently emphasized that the "bottom line" reason why Plaintiff's application was denied was because the "totality of circumstances demonstrated repeated occurrences of poor judgment." (Maloy Dep. p. 87). The majority of the incidents upon which Defendant relies are undisputed – Plaintiff admits that they occurred – and the undisputed evidence demonstrates that Defendant honestly believed that Plaintiff displayed poor judgment. *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989) (finding that employee's "[a]dmission of misconduct provides sufficient foundation for an employer's good faith belief that an employee has engaged in misconduct"); *Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 n. 4 (11th Cir. 1982) (holding that a defendant does not have to prove that it "was correct in its assessment of the employee's performance" but only that

29

it "in good faith believed plaintiff's performance to be unsatisfactory").

The salient question is whether the Defendant's articulated reasons, even if incorrect in the eyes of Plaintiff, were the real reasons for her non-selection. There is no indication that they were not. Because Plaintiff has not shown that Defendant's assessment was a pretext for or motivated by discrimination, summary judgment is appropriate on her disparate treatment claims.

### B.    Retaliation

Plaintiff also claims that Defendant retaliated against her because she complained about discrimination. In order to establish a *prima facie* case of retaliation, Plaintiff must show: (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action. *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1196-97 (11th Cir. 1997). Plaintiff has the burden to show that "the protected activity and the adverse action were not wholly unrelated." *Clover v. Total System Servs., Inc.,* 176 F.3d 1346, 1354 (11th Cir.1999)(citation omitted).

Plaintiff's only cognizable retaliation claim is that her application for SA was denied again in July 1999 in retaliation for her December 1998[23] EEO activity.[24] Summary judgment is

---

[23] Plaintiff identifies the following protected activity: (1) a December 1998 letter to Director Freeh; (2) her first EEO filing on December 2, 1998; and (3) "other protected activity up to and during the background investigation." Plaintiff has not identified any other protected activity during the background investigation, and therefore, the court will consider only her December 1998 actions.

[24] Although Plaintiff contends that "the retaliation took many forms other than the declinations," Plaintiff's other allegations are woefully insufficient as separate retaliation claims because they merely challenge the FBI's business judgment with respect to certain aspects of the reinvestigation. Plaintiff complains about the assignment of Collins to conduct part of the background reinvestigation, the transmittal of the reinvestigation results to Headquarters, the decision not to intimately involve Director Freeh in Plaintiff's situation, the decision to allow Lancaster – but not SAC Lewis – to be involved in the decision-making process, the lack of an opportunity for Plaintiff to rebut the accusations, and the timing of the Personnel Security Interview.

appropriate on this claim because Plaintiff has failed to provide any *prima facie* evidence of a causal relationship between her EEOC activity and the decision. Defendant points out – and Plaintiff does not controvert – that the FBI's second declination in 1999 was the same result the FBI had reached in 1998, before Plaintiff made her discrimination claim.  That the FBI acted the same "before and after" Plaintiff's protected activity defeats the "causal link" between the EEO claim and the second declination. *Erenberg v. Methodist Hospital*, 357 F.3d 787, 793 (8th Cir. 2004); *Shaw v. Greenwich Anesthesiology Associates, P.C.*, 137 F.Supp. 2d 48, 64 n. 17 (D. Conn. 2001) (dismissing retaliation claim where employer acted "the same before and after" the complaint); *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 470 (6th Cir. 1999) (dismissing retaliation claim where employer's decision was "essentially the same before and after she filed the EEOC charge") (Guy, J., concurring).

Moreover, the eight-month lapse between Plaintiff's December 1998 protected activity and her July 1999 declination negates any inference of retaliatory animus.  *See Clark County School District v. Breeden*, 532 U.S. 268 (holding temporal proximity between protected activity and adverse employment action must be "very close" and citing affirmatively several court of appeals cases for the proposition that a 3 to 4-month gap is not enough); *Higdon v. Jackson*, No. 03-14894, 2004 WL 2903979, at *7 (11th Cir. Dec. 16, 2004) (relying upon *Breeden* opinion and concluding that 3-month period is insufficient); *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir.

---

(Pl.'s Brief at 18-19; Complaint, Count IV).  None of these challenges to routine aspects of the FBI's reinvestigation are independent retaliation claims; they are merely quarrels with the investigative process that led to Plaintiff's second declination.  Plaintiff has not presented any evidence to demonstrate that the FBI had an obligation to conduct her reinvestigation in the manner that Plaintiff preferred, nor has she presented evidence that any of these decisions were made with retaliatory intent.  Even when it comes to agencies of the federal government, "federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.'"  *Chapman,* 229 F.3d at 1030.

2001) (recognizing that temporal proximity must be very close); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (finding that 3-month period is insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (determining that 4-month period is insufficient).

The undisputed evidence shows that, after Plaintiff's background investigation was reopened, additional evidence of poor judgment by Plaintiff was revealed, including several incidents that Plaintiff does not dispute. There is simply no evidence that Plaintiff's second declination was linked to her prior protected activity.[25]   Accordingly, summary judgment is appropriate on this claim.

### C.    Hostile Work Environment

Plaintiff also asserts a claim of abusive work environment sexual harassment.[26] Title VII provides that an employer "shall not discriminate against any individual with respect to his terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex*, or national origin . . ." 42 U.S.C. § 2000e-2(a)(1) (1994) (emphasis added). Title VII has been interpreted to specifically allow claims for sexual harassment to rest upon the theory of an abusive work environment. *See, e.g., Burlington Indust., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). A plaintiff attempting to show that she has been subjected to an abusive work environment by a supervisor must prove a number of elements to establish the claim. These elements include proof that: (1) the employee belongs to a protected group; (2) the employee has been subject to unwelcome

---

[25] Plaintiff's retaliation arguments fail to address any of the deficiencies in her *prima facie* case. Plaintiff claims only that "Collins was passionately determined to push for any negative rumor that he could use to portray Plaintiff in a negative light even though FBI policy and EEO laws forbade its use. Collins became angry and upset when he did not receive answers that he wanted." (Pl.'s Brief, at 20).   Plaintiff has provided no evidence of retaliatory motive.

[26] In response to Defendant's Fact No. 250, Plaintiff casually states that, "she was also subjected to a racially hostile work environment."   (Doc. # 86).   This claim has never been asserted by Plaintiff in this case.

harassment; (3) the harassment was based on the sex of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment; and (5) a basis for holding the employer liable.  *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc).  "Regarding this fifth factor, the Supreme Court held recently that in claims based on a supervisor's harassment, an employer may be vicariously liable for actionable hostile environment discrimination caused by a supervisor with immediate (or successively higher) authority over the employee--subject to an affirmative defense." *Mendoza*, 195 F.3d at 1245 n.4 (*citing Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)).

A *prima facie* showing of a hostile work environment arises only where the sexual harassment is so "severe or pervasive" as to "alter the conditions of employment and create an abusive working environment." *Faragher*, 524 U.S. at 786 (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986)).  The court's interpretations of the general standard announced in *Meritor* "are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788 (citing *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80 (1998)).  For example, offhand comments, isolated incidents (unless extremely serious), and other similar tribulations of the workplace will not amount to changes altering the terms and conditions of employment. *See id.*  Furthermore, in order to be actionable under the statute, the work environment must be offensive on both an objective and a subjective level.  That is, the environment must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  *Id.* at 787.  This is a question to be determined with regard to the totality of the circumstances. *Henson*, 682 F.2d at 904.  Additional factors for courts to consider in the totality

33

analysis include: the frequency of the discriminatory conduct, the severity of the conduct, whether the conduct is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interferes with an employee's work performance. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).

An employer is subject to vicarious liability for the actionable hostile environment created by the victim's supervisor, where that supervisor has the authority to affect the terms and conditions of the plaintiff's employment. *Faragher*, 524 U.S. at 807. Where no adverse employment decision has been made or has resulted, the *Faragher* court allows the employer to assert an affirmative defense. *Id.*; *Pennsylvania State Police v. Suders*, 124 S.Ct. 2342, 2347 (U.S. 2004). The affirmative defense requires the defendant to prove "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior." *Faragher*, 524 U.S. at 807. The defendant must also prove that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise, *or* the defendant must show that it responded by taking reasonable corrective action after the plaintiff took advantage of the preventive or corrective opportunities provided by defendant. *Id.*

Plaintiff claims that, over a three-year period of time from 1997 to 2000, she suffered harassment in the following forms:[27]  (1) a "pattern and practice of lewd comments," (2) "repeated discussion, speculation, and dissemination of rumors, false slanderous and libelous information regarding her personal life and sexual history," (3) threats, intimidation, intensive monitoring, and

---

[27] Although, at other points in this litigation, Plaintiff may have asserted alternative bases for her sexual harassment claim, Plaintiff's brief in opposition to summary judgment narrows her claim to the above-referenced instances. (Pl.'s Brief, at 21-22). A detailed summary of the incidents that form the basis for this claim can be found *supra* in the "Relevant Undisputed Facts" portion of this opinion.

micro-managing of Plaintiff and other women in the workplace by SA Jernigan and SA Worley, (4) dissemination of literature that was sexually graphic or offensive and/or suggested that women should be submissive to men,[28] and (5) hostility when Plaintiff successfully acquired more equitable building facilities for use by women.

The court finds that Plaintiff has not met her burden of establishing a *prima facie* case of hostile work environment sexual harassment. She must demonstrate to the court that she was harassed because of her sex, female, and that the conduct as alleged was sufficiently severe or pervasive to alter the terms and conditions of her employment. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1248 n. 5 (11th Cir. 1999) (applying "but for the fact of her sex, she would not have been the object of harassment" test). When all factual disputes and justifiable inferences are resolved in favor of the Plaintiff, the court finds that Plaintiff has failed to adduce sufficient evidence that the conduct as alleged was so severe or pervasive such that it affected the terms and conditions of her employment.

Whether the sexual harassment to which Plaintiff was exposed was sufficiently severe or pervasive is a question to be determined with regard to the totality of the circumstances. "Relatively isolated" instances of non-severe misconduct will not support a hostile work environment claim. *See Saxton v. Am Telephone & Telegraph Co.*, 10 F.3d 526, 533 (11th Cir. 1993). Therefore, when considering whether Defendant's conduct meets the severe or pervasive threshold, this court

---

[28] Specifically, Plaintiff identified the following offensive materials: (1) a 1950s "How to Be a Good Wife" flyer that directed women to be submissive, docile and subservient to their husbands; (2) a $3.00 bill that was labeled "The Feminist States of America" with a serial number of "UCI8PUC2RUNVS?" and "Ima Ballbuster" listed as the "Secretary of Feminist Affairs;" (3) a sexually graphic and offensive cartoon depicting a "naked, wrinkled, overweight elderly woman with very large taut, shiny, erect breasts, standing in front of a mirror;" and (4) a cartoon depicting "offensensitivy" which was posted on the office bulletin board.

considers: the frequency of the conduct, its severity, whether the behavior is physically threatening or humiliating, and if the conduct interferes with the employee's abilities to perform her duties. *See Mendoza*, 195 F.3d at 1246. In *Mendoza*, the court concluded that the following conduct, considered in its totality, fell "well short of the level of either severe or pervasive conduct sufficient to alter terms or conditions of employment:" (1) telling the plaintiff he was "getting fired up;" (2) rubbing his hip against the plaintiff's while touching her shoulder and smiling; (3) making sniffing sounds while staring at the plaintiff's groin; and (4) constantly following and staring at the plaintiff. *Id.* at 1247-48. The *Mendoza* court stressed that the plaintiff in that case presented no evidence that the harasser's conduct was physically threatening or humiliating nor did she show that the cumulative effect of the conduct interfered with her job performance. *Id.* at 1248.

In light of *Mendoza*, the conduct in this case does not rise to the level of being severe or pervasive such that it altered the terms and conditions of Plaintiff's employment. Many of the comments that offended Plaintiff do not relate to gender and/or were made outside Plaintiff's presence. While much of the conduct alleged is unseemly, unprofessional, and boorish, it simply does not rise to the level of severe or pervasive.

Instead, the undisputed facts show that Plaintiff and her alleged discriminators had pleasant relationships that apparently soured at some later point. By Plaintiff's own admission, her jokes and comments at the workplace could have given others the impression that she was not offended and was participating in the activity. (Pl Dep. p. 285-286). Plaintiff admitted that she may have made a remark at work that was interpreted as "male bashing." (Pl Dep. p. 249). In fact, Plaintiff boasted that "there is no subject [she] would not talk about to anyone that wants to talk to [her]." (Pl. Dep., Ex. 22, p. 3). Plaintiff's many acts of inappropriate conduct negate any claim that she was

*subjectively* offended by the acts of others. *See Johnson v. Hondo, Inc.*, 125 F.3d 408, 412 (7th Cir. 1997) (finding no hostile environment existed when plaintiff responded "with coarse language and derogatory comments"); *Reed v. Shepard*, 939 F.2d 484, 491 (7th Cir. 1991) (finding no hostile environment existed where plaintiff showed "enthusiastic receptiveness to sexually suggestive jokes and activities"). Defendant "cannot be held liable for conditions created by [Plaintiff's] own action and conduct." *Reed,* 939 F.2d at 491.[29]  Based upon the undisputed evidence, Plaintiff cannot show that any alleged harassment was unwelcome.

Therefore, when all factual disputes and justifiable inferences are resolved in favor of the Plaintiff, the court finds that Plaintiff has failed to adduce sufficient evidence on her hostile environment claim to create questions of fact for the jury.[30]

---

[29] Plaintiff admits that she instructed co-workers to report to her "when they heard something or observed something," whereupon Plaintiff recorded the co-workers' allegations. (Pl. Dep. p. 479, 480).

[30]  Even if Plaintiff had produced sufficient evidence to support a finding that the conduct, as alleged, was severe or pervasive, Defendant could not be held liable for most of the alleged harassment. The tangible employment action theory of liability is inapplicable to Plaintiff's sexual harassment claim because the law requires that the adverse employment action must be taken or threatened by a harassing supervisor. *See Ellerth*, 524 U.S. at 760-61. Thus, Defendant may assert the affirmative defense, which bars much of the conduct of which Plaintiff complains.  It is undisputed that Defendant has a written sexual harassment policy and a "Sexual Harassment Hotline" for employees. (Defendant's Responses to Request for Production, No. 15).  It is further undisputed that, although Plaintiff claims the alleged harassment began in 1997, she waited until August 31, 1999 to report it.  Plaintiff's failure to report the harassment was not due to lack of knowledge of her reporting options.  In fact, Plaintiff, a law school graduate, contacted an EEO counselor in December 1998 to complain about discrimination (Pl. Dep. p. 115, 118), but never complained of harassment. (Pl. Dep. p. 474).  Plaintiff testified that she made a "conscious decision" to wait until August 1999 to report incidents she claims were sexual harassment. (Pl. Dep. p. 427). Plaintiff has admitted that if she had made a discrimination complaint to her supervisor, SSRA Leggett, "he would have helped me" and that she knew that EEO counselors Rebecca Ellingwood and Lorenza Moore were available to her.  (Pl. Dep. p. 116-117).  The undisputed facts show that Plaintiff did not avail herself of any preventive or corrective opportunities provided by Defendant, but instead made a "conscious decision" not to report her allegations, thereby denying Defendant the

**IV.    Conclusion**

For the reasons stated above, Defendant's motion for summary judgment is due to be granted.
The court finds that no genuine issues of material fact remain for trial as to Plaintiff's claims and that
Defendant is entitled to judgment as a matter of law.  The court also finds that Plaintiff's motion for
summary judgment is due to be denied. A separate Final Judgment will be entered.

**DONE** and **ORDERED** this _____28th_____ day of February, 2005.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

_____

opportunity to take corrective action.  *Fleming v. Boeing Co.*, 120 F.3d 242, 246 (11th Cir. 1997)
(finding that an employer is not liable unless it knew or should have known of harassment). Where
an employer has provided a "mechanism for reporting and resolving complaints of sexual
harassment, available to the employee without undue risk or expense," and the employee fails to take
advantage of the procedure, the employee "should not recover damages that could have been
avoided" had she invoked the complaint procedure.  *Faragher*, 524 U.S. 775; *Fleming*, 120 F.3d at
246.